FILED

2026 Feb-11  AM 11:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| MORGAN SOMERVILLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: |
| vs. | ) | |
| | ) | JURY DEMAND |
| CITY OF HUNTSVILLE, ALABAMA, | ) | |
| and KIRK GILES, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW the Plaintiff, Morgan Somerville, by and through his undersigned attorney, and files and serves this Complaint against Defendants City of Huntsville, Alabama, and Huntsville Chief of Police Kirk Giles.

## INTRODUCTION

This case seeks to redress the harm Defendant City of Huntsville, Alabama ("City") caused to Plaintiff Morgan Somerville by its violations of federal employment law perpetrated against Plaintiff. Defendant City violated Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e(k), *et al*, as amended ("Title VII") / based on Plaintiff's sex (42 U.S.C. § 2000e-2(a)(1)); and Retaliated against Plaintiff after he engaged in acts (participation and opposition) protected by Title VII (42 U.S.C. § 2000e-3). Additionally, Plaintiff alleges co-Defendant Kirk Giles violated Title 42 U.S.C. § 1983 by depriving Plaintiff of his civil rights under color of law, in particular as Police Chief perpetrated sex discrimination against Plaintiff.

1

JURISDICTION AND VENUE

1.  Jurisdiction of this Court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1343:  Plaintiff brings this action under the laws of the United States, thus the district court has original jurisdiction over this case under § 1331; additionally, Plaintiff seeks to recover damages and to secure equitable relief under one or more Acts of Congress providing for the protection of civil rights. See § 1343.

2. Venue is proper as the Northeastern Division of the Northern District of Alabama is the judicial district in which a substantial part of the events or omissions giving rise to Plaintiff's claims, as described below, occurred. *See*  28 U.S.C. § 1391.

3.  Defendant City is a public sector employer that employs fifteen (15) or more people and Defendant Kirk Giles is sued in his individual capacity.

4. Plaintiff filed his Charge of Discrimination with the Equal Employment Opportunity Commission's (EEOC's) Birmingham, Alabama, District Office on or about September 12, 2025. Plaintiff's requested and the U.S. Department of Justice issued a Notice of Right to Sue (NRTS) to Plaintiff on December 5, 2025. A copy of Plaintiff's Right to Sue letter is attached hereto as Exhibit A.

5.  Plaintiff files this Complaint within ninety (90) days after receiving his NRTS.

PARTIES

6.  Plaintiff Morgan Somerville ("Plaintiff" or "Somerville") is an adult over the age of nineteen (19) years of age who resides in Madison County, Alabama.

7. Defendant City of Huntsville, Alabama ("Defendant Huntsville," or "City"), is a

municipality incorporated under the laws of the State of Alabama and which is situated in Madison County, Alabama, and employed Plaintiff during all times relevant to this action.

8. Defendant Kirk Giles ("Giles") is an adult over the age of nineteen (19) years who resides in the Northern District of Alabama and/or all of his acts and omissions and violations of law described herein were perpetrated in Madison County, Alabama, which is situated in the Northern District of Alabama. Additionally, as Chief of Police for the City of Huntsville, Alabama, Giles was a City-authorized decision maker regarding his acts and omissions described herein as such pertained to Plaintiff.

9.   At all times relevant to the events, acts and omissions described herein, Huntsville Police Department ["HPD"] Police Chief Giles, Lt. Michael Danley, Sgt. Dana (a male) Springfield, as well as all HPD Command Staff, HPD decision-makers, and other HPD police officers (both named and unnamed), City Human Resources ("HR") employees, one or more City Attorneys, and HPD Dispatch staff referred to herein, acted within the line, course and scope of their employment with Defendant Huntsville, with their respective supervisors' approval (or post-facto ratification), under color of law, in both their official and personal capacities.

10.  In the alternative, to the extent Defendant Giles and/or any of Plaintiff's HPD supervisors, Command Staff, and/or one or more City Attorneys violated City and/or HPD written policy, law, or Plaintiff's Title VII rights and/or rights under the United States Constitution, the City nevertheless allowed and/or condoned such policy

3

violations, and by doing so either rendered written policies null and void or created new, unwritten policies that effectively allowed Plaintiff's supervisors and other decision makers to violate City written policies, state and/or federal law and/or Plaintiff's constitutional rights.

11.  As regards all acts or omissions alleged herein perpetrated by persons above Plaintiff in his Chain of Command and/or within the City's Administration, such acts and omissions were approved and/or otherwise ratified by *those* persons' HPD supervisors and City decision-makers; additionally, Defendants Giles was the authorized decision maker for the City as regards his respective acts and omissions described herein.

FACTS

***Plaintiff Morgan Somerville***

12.  Plaintiff began his employment with Defendant Huntsville around November 2002.

13.  Plaintiff is male.

14.  From late 2002 until 2006, Plaintiff served the City of Huntsville as an HPD dispatcher.

15.  In 2006 Plaintiff graduated from the police academy and for most of his years of employment with the City of Huntsville he served as a police officer.

16.  Around 2022 Plaintiff decided to move from being a police officer and return to HPD Dispatch (with the official title "Communications Officer").

17.  Over his years as an HPD dispatcher, and according to his annual evaluations,

4

Plaintiff repeatedly met or exceeded his superiors' work-related expectations – until beginning in July and continuing into August and September 2025, about four (4) weeks after the City received service of a former co-workers' employment discrimination lawsuits against the City of Huntsville in which one of those lawsuits quoted a written statement of Plaintiff's that reflected negatively on the City and its police department.

***March 2024 – Plaintiff's Participation and First Written Statement***

18.  While working in HPD Dispatch around first week of March 2024, Plaintiff overheard sounds coming from the nearby office of Sgt Dana Springfield (Dana is male); he could hear that one of his fellow dispatchers, Katrina Brady, was upset in Sgt. Springfield's office, but could not hear much more than that.

19.  Soon after this incident, Sgt. Springfield directed Plaintiff to write a statement about the early March incident and give it to him, Springfield.

20. Plaintiff did as Sgt. Springfield directed and reasonably presumed that the statement he wrote could become part of a harassment or discrimination investigation, or proceeding, and/or case involving the City and Ms. Brady.

21.  Sometime between March and September 2024 Plaintiff learned that Ms. Brady had filed one or more grievances, internal HPD and/or City complaints, against a Dispatch supervisor or two, persons up Plaintiff's coworker's Chain of Command, for race and/or sex discrimination, or both.

22.  Plaintiff knew that Sgt. Springfield was a Caucasian man, that Ms. Brady was

a Black woman, and that in early 2024 Ms. Brady had returned to work in HPD Dispatch following maternity leave.

23. Plaintiff participated in a City / HPD investigation of one or more of Brady's discrimination complaint(s) by providing a written statement to Springfield regarding the early March 2024 incident involving Ms. Brady and one or more of her workplace discrimination complaint(s).

24. In April 2024 the Huntsville Police Department awarded Plaintiff an "Outstanding Unit Citation," signed by Police Chief Kirk Giles, for "excellent work performance for the Huntsville Police Department and exceptional service to the community…"

***September 2024 – Plaintiff's Second Written Statement; Retaliatory Harassment***

25. For the following several months Plaintiff's work in Dispatch was more or less uneventful, but sometime around the first week of September 2024, Plaintiff wrote another, follow-up, statement about the March 2024 incident, and gave either a copy or the original of it, to Katrina Brady.

26. In pertinent part, Plaintiff's September 2024 written statement read:

To Human Resources of the City of Huntsville,

On March 5th of this year an incident occured [sic] with employee Katrina Brady in Sgt. Springfield's office. I had written a statement and cannot attest to anyone else's recollection of the encounter, but I did not hear any party "yelling." I can say that I did hear Mrs. Brady upset and crying/near crying but at no time any yelling. My terminal is one of the closest ones to Sgt. Springfield's office. . .

27. Plaintiff provided his September 2024 written statement to Ms. Brady with the expectation that she would share it with City officials and decision makers, including the City's Human Resources [HR] Department, and that, along with his March 2024 statement, it would be part of a workplace discrimination investigation or proceeding, and could plausibly become part of a court record, could plausibly become evidence in a lawsuit brought by either the City or Ms. Brady against or involving the other.

28. Both Plaintiff's March and September 2024 written statements were examples of Plaintiff participating in an investigation of and/or proceeding regarding workplace discrimination – both protected activities under Title VII.

29. Ms. Brady shared the September 2024 written statement Plaintiff provided her with several coworkers and the statement became known to both rank and file HPD dispatchers and supervisors alike, including those up Ms. Brady's and Plaintiff's Chain of Command – e.g., Supervisor Kristie Hooper, Sgt. Springfield, Lt. Michael Danley, Chief Giles and the City's Human Resources Department.

30. Days after Plaintiff wrote and gave his September statement to Ms. Brady, Sgt. Springfield called Plaintiff into his office about Plaintiff's hair, telling Plaintiff Lt. Danley directed Springfield to basically harass *Plaintiff* in connection with Katrina Brady: "They want her gone," said Springfield about HPD decision makers' feelings on Ms. Brady (specifying Chief Giles and Deputy Chief Michael Johnson by name).

31. Sgt. Springfield told Plaintiff that Ms. Brady had brought up Plaintiff's name

in association with her continuing workplace discrimination issues with the City and, therefore, Lt. Danley directed Springfield to effectively harass Plaintiff, using Plaintiff's hair as a pretext.

32.   Sgt. Springfield directed Plaintiff to write a statement to Internal Affairs about his hair, which Plaintiff did. Plaintiff's statement noted that his hair (length) did not violate policy. Moreover, Plaintiff also noted in his statement that one female coworker wore her hair in a "Mohawk," but was not harassed about her hair.

33.   While the matter was eventually dropped after Human Resources determined Plaintiff's hair did not violate policy, during one or two of Plaintiff's meetings with Sgt. Springfield about the alleged, but nonexistant, hair length violation, Sgt. Springfield bitterly told Plaintiff, that he, Springfield, was angry or frustrated by Ms. Brady "running to HR," and "all that Katrina bullshit" (which Plaintiff understood meant Springfield's frustration / anger over Ms. Brady's complaining about Springfield and workplace discrimination within the HPD).

34.   Also during one of Plaintiff's September 2024 meeting's with Sgt. Springfield in his office, Sgt. Springfield called another HPD Dispatcher, Allison Ellis, a "little hussy," as about 3 months earlier she had reported Springfield and another supervisor to the City's Equal Employment Opportunity (EEO) office in the wake of Springfield's threatening to not reinstate Ms. Ellis following her then-upcoming maternity leave. Sergeant Springfield's remark to Plaintiff about Ms. Ellis was also attended with anger and bitterness.

35. While Plaintiff did not know it at the time, when Sgt. Springfield opined to Plaintiff that HPD dispatcher Ellis a "little hussy," it was within a week or two of the City's EEO officer determining that Sgt. Springfield's June 2024 threat to dispatcher Ellis presented evidence to confirm Springfield's violations of the City's Equal Employment Opportunity Policy as it pertained to sex/pregnancy.

36. The City's EEO officer's sex/pregnancy findings regarding Sgt. Springfield and HPD Dispatcher Ellis, were left to Chief Giles to determine the most appropriate action to take regarding Sgt. Springfield.

37. Despite the City's EEO officer's findings regarding Sgt. Springfield's violations of the City's sex/pregnancy policies, Chief Giles refused to discipline Springfield in any, or in any meaningful, way.

38. During one of Plaintiff's September 2024 meetings with Sgt. Springfield about Plaintiff's hair, Sgt. Springfield claimed and admitted to Plaintiff of his, Springfield's, personal knowledge that all the harassment of HPD Dispatch employees who sided with or otherwise assisted Katrina Brady regarding her workplace discrimination claims, came down the Chain of Command, starting with Chief Giles.

39. Given Sgt. Springfield's then-recent track record involving workplace discrimination, during his September 2024 meetings with Plaintiff, Sgt. Springfield showed he was a willing tool and accomplice of Lt. Danley, and Chief Giles, to threaten and attempt to coerce Plaintiff to "back off" supporting Ms. Brady in her ongoing workplace discrimination complaints and/or investigations involving those complaints.

40.   The meetings, harassment and threats over a hair policy Plaintiff had *not* violated, all of which took place in or around late September 2024, left Plaintiff shaken, not knowing if or when the next time would be, all because he had written a statement about his coworker, Ms. Brady which displeased HPD and/or City decisionmakers.

41.   The City's, through Lt. Danley's and Sgt. Springfield's – and, according to Springfield, Giles's – actions towards Plaintiff, by and through Sgt. Springfield, constituted a warning, a "shot across the bow," to Plaintiff to "back off" from any act that could be perceived by HPD's command staff, its decision makers, as helping or supporting Ms. Brady regarding any workplace discrimination complaint made by her or investigated by the City.

42.   Plaintiff's being called into his supervisor's office, grilled about his hair being "out of policy" (which it wasn't), being told by Sgt. Springfield that Lt. Danley was gunning for Plaintiff because he was perceived as "supporting" another employee with pending workplace discrimination complaints, and being effectively warned by the HPD / the City, "back off" any perceived support of Ms. Brady "or else" the harassment would continue, constituted an employer's adverse action of a type and nature calculated to and/or which would likely dissuade a reasonable worker from bringing a discrimination complaint, opposing discrimination, or participating in an investigation regarding a coworker's complaint.

### December 2024 – Huntsville's City Attorney Contacts Plaintiff

43.   Around the first half of December 2024, City Attorney Jeanne Rizzardi called

Plaintiff regarding his March and September 2024 statements about Katrina Brady.

44.  Ms. Rizzardi claimed she was "confused" by the two statements and told Plaintiff the statements "contradicted" one another other, or something along those lines.

45.  Plaintiff several times explained to this City attorney that, no, there was no "contradiction" – that back in March 2024 Plaintiff did not hear Ms. Brady "yelling" at Sgt. Springfield, but that he did hear Ms. Brady quite upset, crying, or something to that effect.

46.  Plaintiff's then-present sense impression was that the City attorney was frustrated with him for not "towing the line" to give the City a pretext to fire Ms. Brady.

47.  Plaintiff's then-present sense impression was that the City attorney was trying to pressure him to recant or otherwise go back on his September 2024 statement.

48.  Plaintiff's then-present sense impression was that the City was not only *not* trying to conduct a good faith investigation into Ms. Brady's pending internal discrimination complaints, but also that – through the City attorney – the City was making it known to him, Plaintiff, that it would not long tolerate employees who failed or declined to "line up" behind the City to discredit employees it was intent on ridding itself of.

49. During Plaintiff's phone conversation with the City Attorney he told her that if they were – the City was – trying to "get rid" of Ms. Brady, then the way they were doing it "looks bad," as Ms. Brady was being held to a different standard and disciplined for alleged policy violations that other HPD dispatchers were not being held to or

disciplined for.

50. During their December 2024 telephone conversation, City Attorney Rizzardi admitted to Plaintiff that there was a double standard and disparate treatment against Ms. Brady, telling Plaintiff that the City had put Ms. Brady "on imposed probation" after she made discriminaiton claims, and by doing so Ms. Brady's superiors had a free hand to hold Ms. Brady to different standards and discipline and even fire her for policy and practice violations to which her HPD Dispatch co-workers were not subjected.

51. During their December 2024 telephone conversation, City Attorney Rizzardi admitted to Plaintiff that putting City employees on "imposed probation" was a way, manner, method, by which, at least in the City decision makers' minds, the City could perpetrate with impunity disparate treatment in terms and conditions of work, or could retaliate against employees for opposing workplace discrimination or, for that matter, participating in investigations of workplace discrimination.

52. City Attorney Rizzardi's December 2024 telephone call admission/s to Plaintiff demonstrate the City's animus-laden and/or otherwise bad faith practices towards employees who opposed workplace discrimination or who participated in investigations or proceedings regarding discrimination that involved the City.

53. Plaintiff later learned that in a late December 2024 "disciplinary" hearing against Katrina Brady, this same City Attorney tried to get Plaintiff's March 2024 statement into evidence, while either ignoring or declining to introduce his September

2024 statement (quoted above) into evidence.

*January 2025 – Plaintiff Gets "Warned"*

54.  Around January 2025 supervisor Kristy Hooper gave Plaintiff a warning or "Oral Reprimand" for not using his name when answering phones in Dispatch.

55.  This was strange to Plaintiff:  Like many if not most other HPD dispatchers, over the years Plaintiff had rarely answered calls using his name; he never recalls being disciplined for this in his previous years as an HPD dispatcher.

56.  Plaintiff then found out that in a late December 2024 disciplinary hearing against Katrina Brady, several weeks, or a month or so, before Hooper warned or reprimanded him, the City had used "failure to use your name when answering a call," or some similar policy, back in the autumn of 2024 as part of the paper trail to justify firing Ms. Brady in early January 2025.

57.  Around this time, early 2025, Plaintiff also learned that several of fellow HPD dispatchers had testified at the late December 2024 Brady hearing to the effect that, unlike Ms. Brady, they'd never been written-up or otherwise disciplined for failing to use their name when answering Dispatch calls.

58.  In sum, the HPD dispatchers who testified in the December 2024 Brady "disciplinary hearing" testified to a disciplinary double standard between them and Ms. Brady, including the "identify one's self by name when answering calls" practice.

59.  The HPD dispatchers who testified in the December 2024 Brady "disciplinary hearing" effectively corroborated the City Attorney's admission of a disciplinary double-

13

standard regarding Ms. Brady and other HPD dispatchers – which the City Attorney made to Plaintiff several days or weeks before the last December Brady disciplinary hearing.

60. Plaintiff learned that after the December 2024 hearing against Ms. Brady, at least one, if not all three, of the dispatchers who testified were warned that HPD would start enforcing this "identify-by-name" policy and wrote-up at least one or two of them.

61. By starting to discipline HPD dispatchers – including Plaintiff – for violating a policy or practice that for years the City had never before enforced, except against dispatcher Brady, the City attempted to "back fill," to give itself "cover," for using this previously unenforced policy or practice against Ms. Brady; taking note of all this and it disturbed him.

62. By starting to discipline Plaintiff (and one or more HPD dispatchers who had testified favorably towards Ms. Brady during her December 2024 disciplinary hearing) for violating a policy or practice that for years the City had never before enforced except against dispatcher Brady, the City retaliated against Plaintiff for his for participating in a workplace discrimination "investigation" and failing to be a "team player" for the City in doing so.

63. The City's disciplining Plaintiff in or around January 2025, was not only its attempt to "cover," to back fill, for its firing Ms. Brady, but also constituted this employer's adverse action of a type and nature calculated to and/or which would likely dissuade a reasonable worker from bringing a discrimination complaint or participating

14

in an investigation regarding a coworker's complaint.

64.  During the late-December 2024 Katrina Brady disciplinary hearing all three (3) of the HPD dispatchers who testified under oath and in Chief Giles's presence that within HPD Dispatch it was well known Sgt. Springfield considered "retaliation" to be "part of the job," with at least one of the dispatchers testifying that she was present when Sgt. Springfield made this declaration / admission.

65.  Even though this late December 2024 "retaliation is part of the job" testimony occurred in front of Chief Giles, he initiated no substantive investigation regarding this, nor did he discipline Sgt. Springfield; in doing so Chief Giles effectively endorsed and ratified Sgt. Springfield's admission to these HPD dispatchers that "retaliation is part of the job."

***June and Early July 2025 – Additional Protected Activity***

66.  On May 12, 2025, Katrina Brady filed a Title VII employment discrimination lawsuit against the City, as well as 42 U.S.C. § 1983 claims against Chief Kirk Giles and Deputy Chief Michael Johnson, in the United States District Court for the Northern District of Alabama; and on June 9, 2025, a City attorney accepted legal process ("Waiver of Service") of the Summons and Complaint for all defendants in that case.

67. As of June 2025, City decision makers were unhappy and/or otherwise displeased that the City, Chief Giles and Deputy Chief Johnson had been sued by Ms. Brady.

68.  As of June 2025, City decision makers considered it in the City's interest, as

well as in the interest of HPD Chief Giles and Deputy Chief Johnson, to do what they and their subordinates could do to discredit any City employees whom those decision makers believed had or could plausibly corroborate any facts that would support Katrina Brady's lawsuit.

69.    Before accepting service of process in the Katrina Brady case, City decision makers were already on actual notice that dispatcher Sheryl Sief would make a witness in Ms. Brady's favor, as Ms. Seif had testified on Ms. Brady's behalf in the Katrina Brady late December 2024 disciplinary hearing – offering testimony which included Ms. Seif's noting that she understood it was Sgt. Springfield's contention that "retaliation is part of the job" in HPD Dispatch.

70.    By the spring of 2025 Sheryl Sief was disciplined for not using her name when answering dispatch calls; this occurring after the Brady firing and evidenced an attempt by the City to provide cover for itself regarding the Brady firing, and to retaliate against Sief for her December 2024 testimony at the Brady disciplinary hearing.

71.    Before being served with the Brady Complaint, City decision makers were not on actual notice that the Brady Complaint would mention Plaintiff Somerville.

72.    The Brady Complaint served on Defendant City on or about June 9, 2025, included the following allegations involving Plaintiff Morgan Somerville:

> 175. Deputy Chief Johnson claimed that "multiple witnesses" said Plaintiff [Brady] yelled at Springfield in his office during the March 5, 2024, incident.

16

176. Deputy Chief Johnson declined to name any such witness or produce any statement which backed up his accusation.

177. Deputy Chief Johnson claiming the City had "multiple witnesses" Plaintiff was "yelling" was, at best, disingenuous.

178. Deputy Chief Johnson asked Plaintiff, "All the witness statements we have, all those people are lying?" or words to that effect.

179. In fact, in a statement received by the City HR Department on October 3, 2024, HPD dispatcher Morgan Somerville wrote, in pertinent part:

To Human Resources of the City of Huntsville,

On March 5$_{th}$ of this year an incident occured [sic] with employee Katrina Brady in Sgt. Springfield's office. I had written a statement and cannot attest to anyone else's recollection of the encounter, but I did not hear any party "yelling." I can say that I did hear Mrs. Brady upset and crying/near crying but at no time any yelling. My terminal is one of the closest ones to Sgt. Springfield's office. . .

73.   On August 22, 2025, Ms. Brady amended her complaint, but, other than a change in Paragraph numbering, her amended complaint did not differ from her original complaint regarding the above-cited and quoted paragraphs.

*July through August 2025 – Sex Discrimination in Workplace Terms and Conditions*

74.   On or around June 19, 2025, Plaintiff went to a piercing and tattoo studio, Art-I-Fact in Huntsville, and got a small piercing slightly above his left eyebrow.

75.   More than two (2) weeks following Plaintiff getting his piercing, on or about or about July 8, 2025, within 30 days of the City accepting service of Ms. Brady's lawsuit, Plaintiff's direct supervisor Kristy Hooper, confronted Plaintiff over the small

17

eyebrow piercing he had just gotten.

76.  Supervisor Hooper told Plaintiff to remove the piercing.

77.  Because the piercing above his eyebrow was still relatively new, Plaintiff could could not safely remove it by himself, and he let Hooper know this.

78.  Plaintiff told Supervisor Hooper:  "This whole thing is being done just to get Sheryl" – an HPD dispatcher who had had a small nose piercing, but for which she was disciplined or at least "counseled" regarding in the spring of 2025, being one of the dispatchers who had testified in Katrina Brady's favor in the above-referenced December 2024 disciplinary the City had brought against Brady. Hooper admitted, "Yeah, it is."

79. This admission by Supervisor Hooper, that HPD was going after Plaintiff in order to "cover" for its retaliating against Ms. Sief, so upset Plaintiff that, seeing Dispatch was fully staffed that afternoon, he told Hooper he was leaving for the day, but first went the restroom and locker room to gather his personal belongings.

80.  Just before Plaintiff went to the locker rooms, he told Supervisor Hooper that he would go ahead and cover the piercing with a band-aid or an eye patch.

81.  As Plaintiff returned from the locker room, just before leaving, Supervisor Hooper, apparently waiting on Plaintiff, approached him and said, "I don't think that's gonna work," or words to that effect, refusing Plaintiff's offer to simply cover his piercing.

82.   Hooper, as Plaintiff's supervisor, rejected Plaintiff's offer to cover his piercing, even though piercings and tattoos on other dispatchers had been allowed to be

covered; also, women dispatchers were simply simply allowed to have piercings with no discipline meted out to the wearer.

83. The City had a policy or policies about jewelry, but Plaintiff Somerville did not even think about it or them, and did not "willfully" violate any policy, as he had gotten his piercing on a whim.

84. The policy which Chief Giles later invoked to discipline Plaintiff includes the directive: "Earrings will not be worn."

85. However, at least throughout the summer and autumn of 2025, Plaintiff's chain of command – i.e., Supervisor Hooper, Sgt. Springfield, Lt. Danley, Deputy Chief. Charles Brooks, Deputy Chief Michael Johnson, and HPD Chief Kirk Giles – allowed women dispatchers to wear, and women dispatchers regularly wore, earrings without consequence or discipline.

86. Sergeant Springfield, Hooper's direct supervisor and Lt. Danley's right-hand man, called Plaintiff into his office, confronted Plaintiff Somerville about his piercing, and gave Plaintiff an Oral Reprimand.

87. Plaintiff opposed Sgt. Springfield's harassment over his piercing and again argued that it was really being about Sheryl Sief and the City's trying to "cover" for itself going after Ms. Sief for having testified in Ms. Brady's favor.

88. Sergeant Springfield ignored Plaintiff's contention, which was at odds with Supervisor Hooper's admission.

89. Sergeant Springfield ignored or dismissed the fact that HPD women were

allowed to pierce their ears and wear earrings; he ignored that dispatcher Lisa Mason had sported a nose piercing for years, perhaps as much as decade, without being harassed or disciplined; and he ignored that dispatcher Brittany Sain had a nose piercing.

90.  At the time of the July 8, 2025, meeting with Sgt. Springfield, Plaintiff had not even known there was, or had forgotten about, a jewelry policy that would have prohibited his having a small piercing above his eyebrow. In the event, Plaintiff's "violation" was unintentional and similarly situated women were not being harassed or disciplined for their having piercing(s) and earrings in violation of City Policy.

91.  During the July 8, 2025, meeting and Sgt. Springfield's Oral Reprimand, Springfield accused Plaintiff of not being a "team player."

92.  During one of Plaintiff's earlier, September 2024 meetings with Sgt. Springfield about Plaintiff's hair, Sgt. Springfield claimed and admitted to Plaintiff that all the harassment of HPD Dispatch employees who sided with or otherwise assisted Katrina Brady regarding her workplace discrimination claims, came down the chain of command, starting with Chief Giles.

93. During one of Plaintiff's September 2024 meetings with Sgt. Springfield about Plaintiff's hair, Sgt. Springfield called Chief Giles a "pussy" for waiting (too long) to develop a paper trail – a series of write-ups, disciplinary actions – against Ms. Brady, and not just firing her on the spot.

94.  Plaintiff did not like or appreciate Sgt. Springfield's targeting, harassing and/or retaliating against him for having apparently failed to be enough of a "team

player" with the City, especially using sexually discriminatory vehicle to do so.

95.  Plaintiff reiterated his offer, his request, to Sgt. Springfield – to allow Plaintiff to cover his new piercing with a band-aid or eye patch, but Springfield refused Plaintiff's offer and request regarding the offending piercing, and as part of his Oral Reprimand, told Plaintiff the piercing had to be removed.

96.  As he had just told Supervisor Hooper, Plaintiff told Sgt. Springfield that with the piercing being relatively new and near Plaintiff's eye, he could not safely remove it on his own (without risking damage around his eye, or infection, or other such harm).

97.  Plaintiff asked Sgt. Springfield if he could leave work to have a professional remove it that afternoon, but Springfield refused.

98.  Plaintiff told Springfield that in that case, and owing to Plaintiff's work schedule, he would not be able to have the piercing removed by the next morning.

99.  Sergeant Springfield told Plaintiff, "That's your problem to figure out, " or words to that effect.

100.  Plaintiff noted to Sgt. Springfield that that afternoon, HPD Dispatch was adequately staffed, so that he could leave to get his piercing removed, or as another option, Plaintiff could miss or arrive late at the next morning's shift in order to have the piercing removed, but Springfield refused to allow Plaintiff to do either and put Plaintiff in a terrible, "lose-lose," situation.

101.  At one point during Plaintiff's and Springfield's back and forth, Springfield threatened to go beyond an Oral Reprimand and "write-up" Plaintiff (i.e., hit Plaintiff

with a more serious "Written Reprimand"), then threatened to recommend Plaintiff be terminated.

102.  Plaintiff did not take Sgt. Springfield's write-up or termination threat lightly – Springfield outranked Plaintiff, was a police officer in Plaintiff's direct chain of command, and by the Summer of 2025 had earned a reputation in HPD Dispatch for being thin-skinned and eager to retaliate against subordinates.

103. Sergeant Springfield put Plaintiff in an impossible position, which to Plaintiff was ridiculous, maddening and emotionally draining.

104.  Plaintiff said to Sgt. Springfield something to the effect – "You're intentionally boxing me in a no-win situation."

105. Finally, after exacting a satisfactory emotional toll on Plaintiff, Springfield said, something to the effect of, "Well, if Kristy [Hooper] says you can go then you can go!" [to get the piercing removed].

106.  Sergeant Springfield appeared satisfied with giving Plaintiff an Oral Reprimand and directing Plaintiff to remove his small piercing.

107. While an Oral Reprimand is the City's close to the least severe disciplinary action a supervisor can take against a subordinate, Sgt. Springfield violated City Policy by disciplining Plaintiff in the first place, when, as Plaintiff offered and requested, he could simply cover and thus conceal the offending piercing with a band-aid or eye patch.

108.  Plaintiff then left work, returned to the studio where he received the piercing (Art-I-Facts, in Huntsville, Alabama), had the piercing removed, and then returned to his

22

home, exhausted, confused, exasperated and working through the stress of the discrimination he had just suffered.

109.  Plaintiff's being called-in to Sgt. Springfield's office and receiving an Oral Reprimand from Springfield, constituted workplace sex discrimination and disparate treatment based on sex / gender, and, as Plaintiff would soon discover, retaliation for his participating in the Katrina Brady investigation in 2024.

110.  The City, through Supervisor Hooper and Sgt. Springfield, disciplining Plaintiff over his opposition, and demanding he remove his small piercing, constituted sex-/gender-based disparate treatment between Plaintiff and women HPD Dispatchers who were allowed to wear earrings and have piercings at the workplace.

111.  As of and through the summer of 2025, women HPD dispatchers are allowed to, and regularly did and more than likely continue to, wear earrings, and at least one woman dispatcher for years wore a facial piercing, without consequence.

### August / September 2025 – Departmental Hearing; Discrimination and Retaliation Continues

112.  On August 11, 2025, HPD Dispatch Supervisor Hooper brought Plaintiff an envelope which contained a Notice of Departmental Hearing, signed and dated by Defendant Kirk Giles.

113.  The Departmental Hearing claimed to, but only partly concerned the accusation that Plaintiff had perpetrated "willful neglect or disobedience" and/or "willful neglect or deliberate refusal" to follow "standing rules" or "lawful orders" of his

23

superiors by violating City / HPD Written Directive 401.3 Section F, owing to Plaintiff's having a small piercing above his eyebrow more than a month earlier, on July 8, 2025.

114. Defendant Giles convening a Departmental Hearing because Plaintiff had gotten a small piercing, and had it in the workplace for about two (2) weeks before Hooper or Springfield bothered to notice it, then having had it professionally removed within hours of being ordered by Sgt. Springfield to remove it, reeked of bad faith and Giles' desire to punish Plaintiff beyond all reasonable bounds of City Policy or practices.

115. When Giles notified Plaintiff of a Departmental Hearing over Plaintiff's small piercing (which Plaintiff had had removed more than one (1) month *before* Chief Giles issued the August 11 Notice), it made Plaintiff reasonably believe Giles and the City were coming after him, as it had come after Katrina Brady and other HDP dispatchers whom the City sought to punish for participating in workplace discrimination matters in a manner that displeased Giles and the City.

116. Defendant Giles notifying Plaintiff of a Departmental Hearing over Plaintiff's small piercing, more than one (1) month *after* Sgt. Springfield had already Orally Reprimanded Plaintiff and threatened Plaintiff with termination, evidenced bad faith, pretext, and Giles' desire to punish Plaintiff beyond all reasonable bounds of City Policy or practices.

117. Defendant Giles notifying Plaintiff of a Departmental Hearing over Plaintiff's small piercing, knowing that women HPD dispatchers regularly wear earrings and other piercings without facing anything akin to such discipline or threatened

disciplined, evidenced bad faith, sex discrimination, and Giles' desire to punish Plaintiff beyond all reasonable bounds of City Policy or practices.

118. Defendant Giles notifying Plaintiff of a Departmental Hearing – putting the onus and burden on Plaintiff to defendant himself against either a City Policy Giles was misapplying, or defend himself over a sexually discriminatory City Policy Giles was intentionally determined to wield against Plaintiff over Plaintiff's small piercing – constituted sex-based disparate treatment and altered the terms and conditions under which Plaintiff had to work based on Plaintiff's sex, male.

119. On the morning of August 25, 2025, HPD Chief Kirk Giles presided over a Departmental Hearing (or simply, hearing) against Plaintiff in his Giles's office in downtown Huntsville, Alabama.

120. Present at the Hearing were Defendant Chief Giles, City Attorney Jeanne Rizzardi, Captain Tim Clardy, Lt. Michael Danley, Captain Jesse Sumlin, Deputy Chief Charles Brooks and Plaintiff Morgan Somerville.

121. Plaintiff's September 2024 written statement about Katrina Brady, which showed up in Katrina Brady's spring 2025 U.S. District Court Complaint, played a significant part in the hearing.

122. According to Defendant Giles's August 11, 2025, Notice of Departmental Hearing to Plaintiff, the specific City / HPD Policy Plaintiff was accused of violating was "Written Directive 401.3 Section F: JEWELRY," which Chief Giles quoted in full in the Hearing Notice, to wit:

25

Uniformed personnel may wear a wristwatch, medical identification bracelet, and no more than two rings. A wedding band and an engagement ring may be counted as one ring. Earrings will not be worn. Necklaces or other items of jewelry may be worn, provided they are not visible while in uniform. Pens and pencils need not be concealed. However, they must be carried in the designated slot on the uniform shirt, unless wearing the external vest carrier.

123.   According to Giles's Hearing Notice to Plaintiff, "Written Directive 401.3 Section F:   JEWELRY," does not clearly or specifically prohibit piercings such as Plaintiff's small one above his eyebrow; and on July 8, 2025, Plaintiff had offered and asked both Supervisor Hooper and Sgt. Springfield to allow him to cover it with a band-aid (so it would not be visible during work), but both Hooper and Springfield refused Plaintiff's offer and request.

124.   During the August 25 Hearing Plaintiff opposed the discrimination and testified that he had not intentionally or purposefully violated any City or HPD policy.

125.   Neither Chief Giles nor any other City official present could provide any substantive evidence that Plaintiff willfully or purposefully neglected or deliberately refused to follow the City's jewelry, or any other, policy.

126. To Plaintiff, the Hearing as well as its aftermath, was surreal, intimidating, disturbing, certainly discriminatory, and caused him severe emotional distress.

127.   Sergeant Springfield's having already disciplined Plaintiff with an Oral Reprimand (and other threats) on July 8, about 1½ months before the August 25 Hearing, shows the City, through Giles, was subjecting Plaintiff to the prospect of double-punishment for the same alleged infraction.

128. As Plaintiff had already received an Oral Reprimand in early July from Sgt. Springfield regarding the piercing, holding a Departmental Hearing on the matter showed the alleged infraction, a small eyebrow piercing, was of a type and nature that evidenced the City's – through Chief Giles and the others in attendance at the August 25 hearing – motivation / pretext to retaliate against Plaintiff for engaging in a Title VII protected activity by participating in an investigation or proceeding involving workplace discrimination (both Katrina Brady's and his own on July 8, 2025) and/or for opposing workplace discrimination, which Plaintiff did, or tried to do, on July 8, 2025.

129. Evidence of the City's retaliatory motivation also includes that, at one point during the August 25 hearing, Lt. Danley sat forward in his chair and told Plaintiff he was "disappointed" in him, as Lt. Danley said he thought that he and Plaintiff had had a good working relationship, to which Plaintiff, after pausing, replied:  "We managed," or words to that effect.

130. Evidence of the City's retaliatory motivation also includes that Lieutenant Danley's tone then changed and became accusatory as he confronted Plaintiff, saying that Plaintiff had been "instrumental" (or something to that effect) in the (internal, City) case against Katrina Brady, but that suddenly Plaintiff "flipped on us," had "buddied up to Katrina," or words to that effect.

131. Evidence of the City's retaliatory motivation also includes that Plaintiff told Lt. Danley and the other City officials present opposing Danley, saying that, no, he had not "buddied up" to anyone and the whole thing – both forcing Plaintiff to endure a

27

hearing, as well as Lt. Danley's belligerence – reeked of "targeting" (i.e., retaliation).

132. Evidence of the City's retaliatory motivation also includes that Plaintiff saw Lt. Danley grow angrier at him when he at least twice used the term "targeting" in connection with how he was being treated in relation to – in HPD's and the City's assessment – his failing to be a "team player" against Katrina Brady.

133. Evidence of the City's retaliatory motivation also includes that at the August 2025 Hearing Lt. Danley accused Plaintiff of "flipping" on HPD and/or the City and "buddying up" with Katrina Brady, and none of City officials in attendance, including Chief Giles and City Assistant Attorney Rizzardi, indicated any disagreement with Lt. Danley or otherwise speak up on Plaintiff's behalf or in his defense.

134. Evidence of the City's retaliatory motivation also includes that when, at the August 2025 hearing, Plaintiff accused the HPD and/or City of "targeting" (that is, retaliating against) him for participating in the Katrina Brady sex and race discrimination investigation/s, none of the City officials in attendance, including Chief Giles and City Assistant Attorney Rizzardi, objected to this characterization or otherwise disagreed with Plaintiff.

135. Evidence of the City's retaliatory motivation also includes that, while the topic of the late August 2025 hearing was supposed concern whether or not Plaintiff willfully or deliberately violated City jewelry policy back in early July, 1½ months earlier, during the hearing, Lt. Danley confronted Plaintiff with the accusation that Plaintiff wrote contradictory statements regarding Katrina Brady.

28

136. Lieutenant Danley's accusation that Plaintiff made "contradictory statements," or that his March and September written statements were at odds with each other regarding Katrina Brady, was virtually the same accusation made by City Attorney Rizzardi to Plaintiff in December 2024, and who was seated just to Plaintiff's right during the hearing.

137. Plaintiff turned to City Attorney Rizzardi and said words to the effect of, "I *told* you that I didn't contradict myself," but Ms. Rizzardi made no response.

138. In fact, Plaintiff had pointed out and tried to explain to City Attorney Rizzardi about 8 ½ months before, in December 2024, that his March and September 2024 written statements about Katrina Brady did not contradict each other, and, despite the frustration in Ms. Rizzardi's voice towards Plaintiff, by the end of the December 2024 telephone call, Plaintiff recalls Ms. Rizzardi saying to him words to the effect that she understood and accepted his explanation of the non-contradictory substance contained in his March and September 2024 Brady-related statements.

139. Evidence of the City's retaliatory motivation also includes that when something approaching a shouting match ensued between Lt. Danley and Plaintiff regarding Plaintiff's 2024 Katrina Brady-related written statements, Lt. Danley raised his voice at Plaintiff and said something like: *"Yes they are!"* [contradictory statements] and Plaintiff replied, *"No, they aren't!"* and Lt. Danley repeated his accusation and Plaintiff repeated his reply.

140. Evidence of the City's retaliatory motivation also includes that when Chief

29

Giles finally stopped this Danley-Plaintiff exchange, he did not disavow Lt. Danley's attacks on Plaintiff; attacks that had everything to do with Katrina Brady and her workplace discrimination claims (and by August 2025, a pending employment discrimination lawsuit) and nothing to do with whether or not Plaintiff had willfully or purposefully violated the City's jewelry policy.

141.  Evidence of the City's retaliatory motivation also includes that Lt. Danley's becoming so belligerent towards Plaintiff regarding Katrina Brady and the investigation of her workplace discrimination allegations against the City, revealed that as of late August 2025, what most angered him and the assembled City officials and decision makers (more than any alleged jewelry policy violation), was Plaintiff's September 2024 statement regarding Katrina Brady, by this time incorporated into Ms. Brady's public record lawsuit.

142.  To Plaintiff the hearing itself was stressful, intimidating and nerve-wracking.

143.  During the hearing, Deputy Chief Brooks at least twice accused Plaintiff of intentionally violating the City's jewelry policy, and of "insulting our intelligence," but Plaintiff repeatedly said he did not intentionally / purposefully / willfully violate any policy.

144.  During the hearing, Deputy Chief Brooks said accusations to the effect of, "I can't go in front of the City Council with piercings!" apparently oblivious to the fact that appearing before the City Council is a public forum and working Dispatch is done telephonically, where the public does not see the dispatchers.

30

145. During the hearing, Plaintiff tried to impress upon Deputy Chief Brooks and the other City Officials in attendance that women HPD dispatchers had had piercings – that is, referring to two (2) women dispatchers who were allowed to have piercings – but Deputy Chief Brooks and the others ignored or disregarded Plaintiff's points about such dispatchers one policy or practice regarding piercings, while Plaintiff was being interrogated and punished under the same, or some other, policy.

146. Deputy Chief Brooks' real or feigned indignation towards Plaintiff indicated Brooks' and the assembled officials' bad faith, as in previous years Deputy Chief Brooks had openly displayed with impunity his neck tattoos and/or other tattoos when a City Policy then prohibited such display.

147. During the August 25 Departmental Hearing, the attending City officials and decision makers' tone and bearing and questioning, and the fact that none of the City officials in attendance contradicted Lt. Danley or his attacks on Plaintiff in relation to the Katrina Brady workplace discrimination matter, was an adverse employment action perpetrated by the City of a type and nature likely to and/or likely intended to dissuade a reasonable worker from filing or supporting a complaint of discrimination or participating in an investigation of workplace discrimination.

148. On August 27/28, 2025, about three (3) days following the hearing, Chief Giles disciplined Plaintiff again (as Plaintiff had already been disciplined by Sgt. Springfield in July 2025), finding Plaintiff committed "willful neglect"  and "disobedience" and deliberately violating City "Written Directive 401.3 Section F:

31

JEWELRY," and further ordered that Plaintiff would be suspended from work without pay during the second week of September 2025.

149. In addition to Sgt. Springfield's Oral Reprimand to Plaintiff in July 2025, within a week or so following Plaintiff's July 8 2025 "piercing incident," Sgt. Springfield suddenly prohibited Plaintiff from leaving work on Wednesday mornings following his completion of a 40 hour work week.

150. The City's – through Sgt. Springfield – adverse change in / action taken against Plaintiff's ability to leave work following the completion of his weekly scheduled hours, changed the terms and conditions of Plaintiff's work based on the sexually discriminatory practice of holding Plaintiff to disparate, male-female, workplace standards, rules, practices and policies.

151. The City's – through Sgt. Springfield – adverse change in / action taken against Plaintiff's ability to leave work following the completion of his weekly scheduled hours, caused Plaintiff humiliation, frustration and stress.

152. The City's – through Sgt. Springfield – actions were also retaliatory and affected the terms and conditions of Plaintiff's employment, were humiliating and meant to punish Plaintiff for not being a "team player" against Brady – as later confirmed and ratified by the City officials and decision makers who attended and participated in the late August hearing.

153. The City double- or triple-punished Plaintiff for a single alleged policy infraction.

32

154.  Double- or triple- punishments / disciplinary actions against employees like Plaintiff for a single alleged, but in fact non-existent, policy infraction deviated from the City's own standard disciplinary procedures, which were, or were supposed to be, progressive and, normally, an employee found to have violated a policy would be punished once, not twice, or three times, for a single (alleged) infraction.

155.  Chief Giles late August 2025 disciplining Plaintiff over a piercing Plaintiff had gotten more than two (2) months earlier, in late June 2025, was mere pretext for retaliating against Plaintiff regarding his participation in the Brady discrimination investigation – as evidenced by Lt. Danley's anger, frustration and lashing out at Plaintiff during the late August hearing, all backed, confirmed and ratified by the silence of Chief Giles and City Attorney Rizzardi when Lt. Danley lashed out at Plaintiff during the August hearing.

156.  At the least, Chief Giles suspending Plaintiff for three (3) days without pay was not entirely unrelated to Plaintiff's protected activities:  That is, Plaintiff's providing a written statement to Katrina Brady as part of an investigation of Ms. Brady's claims of an opposition to workplace discrimination within the City's Police Department.

157.  At the least, Chief Giles suspending Plaintiff for three (3) days without pay was not entirely unrelated to Plaintiff's protected activities:  That is, Plaintiff's September 2024 written statement to Katrina Brady making an appearance in Ms. Brady's lawsuit against the City, about which received actual notice of during the second week of June 2025, and which Plaintiff believed that his September 2024 could plausibly

become part of a court record and/or become evidence in a lawsuit brought by either the City or Ms. Brady against or involving the other.

158.   The City's adverse employment action against Plaintiff, by and through Chief Giles suspending him without pay for three (3) days, was rooted in and inextricably intertwined with the Brady workplace discrimination matter and was of a type and nature likely to, and/or likely intended to, dissuade a reasonable worker from filing or supporting a complaint of discrimination, or opposing workplace discrimination, or participating in an investigation of workplace discrimination.

159.   By and through the acts and omissions of members of Plaintiff's Chain of Command, City officials and HPD decision makers, the City worked to build a paper trail against Plaintiff in relation for his participating in the Katrina Brady investigation in a way that displeased City decision makers.

160.   By and through the acts and omissions of members of Plaintiff's chain of command, City officials and HPD decision makers, the City worked to create an environment wherein a reasonable person such as Plaintiff would have felt compelled to resign, in order to avoid facing additional harassment, discrimination, humiliation and retaliation.

161.   Defendant Giles conducting a Departmental Hearing against Plaintiff under color of law, as HPD Chief of Police, and used both the hearing and the discipline perpetrated against Plaintiff – three (3) days suspension without pay – to discriminate against Plaintiff, a male, in a way and a manner women HPD dispatchers are not obliged

to suffer or endure, which constituted an unlawful deprivation of Plaintiff's civil rights based on his sex.

162. As stated during or near the last week of April 2025, City Human Resources HR Analyst II Dylan Yarbrough holds out that as far as the HPD Chain of Command goes, "people in positions of power being retaliatory is ultimately up to Chief Giles," which a reasonable person could interpret to mean that ultimately and only Chief Giles decides who is or is not being retaliatory within the City's Police Department – not Human Resources, not the Legal Division, not the City Council, just Chief Giles.

163. As stated during or near the last week of April 2025, City Human Resources HR Analyst II Dylan Yarbrough holds out that Lt. Danley and Sgt. Springfield "involved in (Katrina Brady's) lawsuit are on high alert and having to defend things."

164. Former HPD dispatcher Allison Ellis also filed a lawsuit in U.S. District Court in May 2025 against the City of Huntsville and Lt. Michael Danley.

### August / September 2025 – Chief Giles's Severe Mishandling of Grievance Procedure and the City's Facially Discriminatory Policies

165. At all times pertinent to this Complaint, HPD Dispatch operated in an office setting, that is, dispatchers worked in cubicles, only interact with the public via telephone and HPD is generally off limits to the public.

166. While standardized shirts and pants are worn by HPD dispatchers, they are not Uniformed Personnel, such as police officers.

167. City Policy 22.7 states that uniforms are intended "for employees (1) who

35

require personal protection from workplace hazards; (2) whose working conditions subject their clothing to excessive wear and tear; and (3) whose daily responsibilities require obvious personal identification as a City employee with the public. A uniform is not intended for employees who work primarily in an office setting."

168.  Huntsville Police Department dispatchers and their work do not fit into any of the uniform-intended categories set out in City Policy 22.7 and dispatchers work primarily in an office setting.

169. By the City's own policies and definitions, HPD dispatchers are not public-facing, uniformed employees and HPD dispatchers do not consider themselves "uniformed employees."

170.  As alleged *supra*, as an HPD dispatcher, even though Plaintiff was not a uniformed employee, on July 8, 2025, he offered and requested to cover his small piercing so that it would not be visible, but Supervisor Hooper and Sgt. Springfield rejected this offer and request.

171.  In both his Notice of Departmental Hearing and Disciplinary Action Notice, Chief Giles cited and quoted-in-full HPD "Written Directive 401.3 Section F: JEWELRY" – which does not prohibit a piercing such as the one Plaintiff obtained in June 2025; and does not prohibit such a piercing if it is covered and "not visible."

172.  Chief Giles using Written Directive 401.3 Section F as a vehicle and pretext to punish and discipline Plaintiff was itself a policy violation.

173. City Policy 3.2 in pertinent part prohibits workplace "discrimination and/or

preferred treatment concerning any individual on the basis of… sex," and Chief Giles violated Policy 3.2 by using Written Directive 401.3 Section F to punish and discipline Plaintiff, while ignoring women HPD dispatchers who wore earrings and piercings in violation of the same Written Directive.

174.  City officials, including City Attorney Rizzardi who attended the August 25, 2025, Departmental Hearing, condoned and/or ratified Chief Giles' violating the City Policy/ies prohibition on sex discrimination.

175.  Chief Giles using Written Directive 401.3 Section F, which did not prohibit Plaintiff's piercing and/or did not prohibit it if covered, i.e., was "not visible," as a vehicle and pretext to punish and discipline Plaintiff, violated City Policy 3.1 (C)(6) requires employees be provided "due process for all disciplinary matters."

176.  Chief Giles using Written Directive 401.3 Section F, which did not prohibit Plaintiff's piercing and/or did not prohibit it if covered, i.e. was "not visible," as a vehicle and pretext to punish and discipline Plaintiff, amounted to harassment and thus violated City Policy 3.3, which defines harassment as "A course of conduct directed at a specific person… that causes substantial emotional distress in that person… and serves not legitimate purposes."

177. Chief Giles using Written Directive 401.3 Section F, which did not prohibit Plaintiff's piercing and/or did not prohibit it if covered, i.e., was "not visible," as a vehicle and pretext to punish and discipline Plaintiff, violated City Policy 3.3(D), which states in pertinent part:  "Harassing conduct in the workplace, whether committed by

supervisors or non-supervisory personnel, is prohibited."

178.   In the case that Chief Giles intended – but repeatedly failed or refused – to use Huntsville Police Department's April 2025 updated Policy H, which prohibited certain piercings, those prohibitions only applied if such piercings were "visible to the public," which Plaintiff's was not.

179.   In the case that Chief Giles intended – but repeatedly failed or refused – to use Huntsville Police Department's April 2025 updated Policy F, this policy's Subsection 2. states:   "Non-uniformed personnel [such as Plaintiff] may wear jewelry if the employee's appearance remains conservative."

180.   While updated HPD Policy F 2.'s word "conservative" is overly vague and subjects employees to unfair, subjective and/or discriminatory supervisor decision making, as a Communications Officer in HPD Dispatch Plaintiff maintained a conservative appearance.

181.   During or around 2024-2025, one of Plaintiff's women HPD dispatchers – a recent hire – wore a Mohawk, but was never written-up, nor did Defendant Giles subject her to a Departmental Hearing or suspension without pay for not being "conservative."

182.   Plaintiff's Mohawk-wearing woman coworker's appearance was not necessarily "conservative," but she performed her duties responsibly and professionally.

183.   In the Summer of 2025, Supervisor Hooper, Sgt. Springfield, and all those above Plaintiff in his Chain of Command, allowed HPD Dispatcher Brittany Sain, a woman, to wear a nose ring (occasionally covered with a Band-Aid), that is, a piercing,

38

while on the job.

***Chief Giles' Hands-On, Personal Integration into HPD Dispatch and Actual Knowledge of Plaintiff's Piercing, Etc.***

184.  During 2024 and 2025, Chief Giles developed a track record for injecting himself into HPD Dispatch employee monitoring and discipline, not the least demonstrated by his monitoring matters – through Sgt. Springfield and Lt. Danley – involving Plaintiff Morgan Somerville.

185. Examples of Chief Giles injecting himself into HPD Dispatch employee monitoring and discipline include Sgt. Springfield's September 2024 personal knowledge-based claim that harassment of HPD Dispatch employees (such as Plaintiff) who assisted Katrina Brady regarding her workplace discrimination claims started with Chief Giles, and, in July and August, 2025, Chief Giles personally himself in Plaintiff's small piercing incident, along with the sex discrimination attended the disciplinary acts and omissions related thereto.

186.  During 2024 and 2025 it was HPD Dispatch protocol and practice for Sgt. Springfield to report incidents such as the incident between him and Plaintiff on July 8, up the HPD Chain of Command, beginning with Lt. Michael Danley and eventually ending with Chief Giles.

187.  During 2024 and 2025, it was common practice within HPD for persons up Plaintiff's Chain of Command, including Sgt. Springfield and Lt. Danley, to speak directly with, inform, and update Chief Giles about various matters occurring within

HPD Dispatch, including disciplinary matters, such as the incident that occurred between Sgt. Springfield and Plaintiff on July 8, 2025, Plaintiff's having his small piercing removed on July 9, and, the following week, Sgt. Springfield forbidding Plaintiff to leave work after reaching his 40-hours / week mark.

188.  Between August 11, 2025, when Chief Giles signed, dated and delivered his Notice of Departmental Hearing to Plaintiff, and August 25, 2025, the day the Departmental Hearing took place, Giles visited HPD Dispatch, walked over to Plaintiff and spoke briefly and informally with Plaintiff face to face.

189.  On the day between August 11-25, 2025, when Chief Giles visited HPD Dispatch and spoke briefly with Plaintiff mere feet from each other, looking at one another, for 3-4 minutes; it would have been plain and obvious to Giles or anyone facing Morgan Somerville that he wore no piercing.

190.  During August and September 2025, in the context of subjecting Plaintiff to a Departmental Hearing and, then, suspension from work without pay, Defendant Giles violated various City Policies with reckless abandon and without regard for Plaintiff's right to sex- / gender-based equal protection under the law.

191.  During August and September 2025, in the context of subjecting Plaintiff to a Departmental Hearing and, then, suspension from work without pay, Chief Giles's City Policy violations, disparate treatment of Plaintiff, and other sex discrimination towards Plaintiff, were condoned and/or ratified by City officials and decision makers, including but not limited to the City's Legal Department, City Council, and Mayor (to whom Chief

Giles reports and/or whose policies and practices he is charged with implementing).

192.  During August and September 2025, in the context of subjecting Plaintiff to a Departmental Hearing and, then, suspension from work without pay, Chief Giles and the City applied City Policies unequally and unfairly between women HPD dispatchers and Plaintiff, who is male.

193.  Chief Giles knew about the July 8, 2025, incident between Plaintiff, Hooper and Giles pursuant to City / HPD protocol and/or practice, which meant Sgt. Springfield reported the incident up his Chain of Command, first to Lt. Danley, then from Lt. Danley up, eventually stopping at Chief Giles.

194.  On August 11, 2025, when Chief Giles issued his Notice of Departmental Hearing to Plaintiff, Chief Giles knew Plaintiff had had his piercing removed more than a month before, on July 9, 2025, as, pursuant to City / HPD protocol and/or practice Sgt. Springfield would have reported this follow-up to the July 8 incident up the Chain of Command to Chief Giles.

195.  On August 11, 2025, when Chief Giles issued his Notice of Departmental Hearing to Plaintiff, Chief Giles knew that Sgt. Springfield no longer allowed Plaintiff to leave work on Wednesday's, upon completion of his 40-hour work week, as, pursuant to City / HPD protocol and/or practice Sgt. Springfield would have reported this follow-up to the July 8 incident up the Chain of Command to Chief Giles.

196.  By August 25, 2025's Departmental Hearing, Plaintiff's small piercing had been gone from above Plaintiff's left eyebrow for around seven (7) weeks, close to two

41

months, and the fact that Plaintiff showed up to the Departmental Hearing without any piercing would have been visible and obvious to any of the others who attended the hearing.

197.  In August and September 2025, the City, by and through Chief Giles's acts and omissions, discriminated against Plaintiff based on his sex, male, when similarly situated women HPD dispatchers were not subjected to the same mistreatment and adverse employment actions as Plaintiff.

198.  Chief Giles had no discretionary authority to commit discriminatory and retaliatory acts against Plaintiff based on Plaintiff's sex / gender; Giles' duty of equal treatment of men and women was mandatory, under both policy and law.

## *Damages and Constructive Discharge*

199. Beginning in July 2025 and continuing into September, the workplace harassment, disparate treatment and retaliation against Plaintiff became severe and pervasive.

200.  Any reasonable employee subjected to the same treatment under the same circumstances as Plaintiff would find such a work environment permeated with disparate treatment, with discriminatory intimidation and insult and harm, that was severe and pervasive enough to alter the conditions of the employment and create abusive working conditions.

201.  In the Summer of 2025 Plaintiff found himself in such a work environment.

202.  In the wake of Plaintiff's adverse change in work conditions starting in July

2025; continuing into August with the Notice of Departmental Hearing, then Departmental Hearing itself, at which Lt. Michael Danley scolded Plaintiff for "flipping" to assist Katrina Brady; continuing further when on August 28 Giles's issued his Notice of Disciplinary Action; and into September 2025 when Plaintiff was forced to endure a humiliating suspension from work without pay, Plaintiff began, then continued, a downward emotional and mental health spiral.

203. As of September 2025, over his career 20-plus year career with the City of Huntsville as both a police officer and dispatcher who had garnered numerous awards and commendations, Plaintiff saw that his days as an HPD employee were numbered – noting that Chief Giles' August 27/28 Disciplinary Action Notice also threatened Plaintiff with "more stringent disciplinary action, up to and including termination," if Plaintiff was found to have committed "additional violations, whether or not directly related to [the piercing violation]," which Plaintiff had not, in fact, violated – that his time at HPD was on life support.

204. In just a year leading up to September 2025, Plaintiff knew about other HPD employees subjected to decisionmaker targeting, retaliation and/or being on the receiving end of ginned-up paper trails created to either to fire the targeted employee, demoralize a targeted employee to make them resign, or, in one case, to refuse to reinstate an on-leave targeted employee.

205. Based on Sgt. Springfield's actions in July 2025, then Chief Giles' and those in attendance at the August 25 Departmental Hearing, then Chief Giles' suspending him

43

without pay in September 2025, Plaintiff's more than two (2) decades employed by the City told him the harassment, discrimination and retaliation he had experienced would not end until he quit or was fired.

206. Plaintiff's assessment was based on fact and experience, not speculation.

207. The stress overwhelmed Plaintiff, knowing that the pressure, harassment, targeting and retaliation would continue, but not knowing exactly when or how the next shoe would drop.

208. As a direct result of Giles' and the City's Summer 2025 discriminatory and retaliatory acts and omissions, in or around mid-September 2025, Plaintiff requested medical / disability retirement.

209. Plaintiff's request had to be approved by Retirement Systems of Alabama (RSA), given his employment at a municipal division of the State of Alabama.

210. Following review and consideration, on or about October 8, 2025, the RSA approved Plaintiff's request for disability retirement.

211. The City and HPD officials were also notified of Plaintiff's request for and RSA approval of disability retirement.

212. Plaintiff worked at HPD Dispatch until December 1, 2025.

213. As set forth herein, Defendant City's discriminatory and retaliatory acts and omissions perpetrated against Plaintiff were intentional, violated federal law, and proximately caused Plaintiff to suffer humiliation, terrible stress, severe mental anguish, and loss of income and benefits, and ultimately and directly lead to Plaintiff's requesting

and receiving disability retirement from the RSA.

214. As set forth herein, Defendant Giles's discriminatory and retaliatory acts and omissions perpetrated against Plaintiff were intentional and/or perpetrated with reckless disregard for Plaintiff's rights, and deprived Plaintiff of his civil rights and were perpetrated under color of law; they proximately caused Plaintiff to suffer humiliation, terrible stress, severe mental anguish, and loss of income and benefits, and in concert with the City's unlawful acts and omissions set forth herein, ultimately and directly lead to Plaintiff's requesting and receiving disability retirement from the RSA.

## COUNT I
## Title VII [42 U.S.C. §§2000e-2(a)(1)]
## Sex-Based Discrimination

215. By this reference Plaintiff reiterates and incorporates the allegations set forth in Paragraphs 1-5 (Jurisdiction / Venue); 6-7, 9-11 (Parties); 12-17, 24, 35-42, 61, 64-65, 67-68 (Background / Context); and 74-125, 142-146, 148-151, 153-154, 160-162, 165-183, 184-198, 199-214 (Sex Discrimination and Damages), as if fully set out herein.

216. Under Title VII it is unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's sex.

217. But for Plaintiff's sex, Defendant Huntsville would not have subjected him to the disparate treatment from his women coworkers in the workplace.

218. The sex- / gender-based disparate treatment the City perpetrated against

Plaintiff included, but was not necessarily limited to, Plaintiff:  *(a)* being scolded and reprimanded and humiliated by Sgt. Springfield and ordered to remove a piece of innocuous jewelry when women dispatchers were not subjected to the same humiliation and invasion of bodily autonomy; *(b)* being prohibited from leaving work following his completion of a 40-hour work week when over the course of a year or so he had been allowed to do so; *(c)* being subjected to a degrading and humiliating "Departmental Hearing" over a policy Plaintiff had *not*, in fact, violated when similarly situated women dispatchers were not made to suffer such strange and exasperating indignity; *(d)* while Chief Giles and City Attorney Rizzardi looked on in silence, being berated by Lt. Danley during the August 25 Departmental Hearing about Katrina Brady, when the subject of the hearing was supposed to be about HPD Dispatch jewelry policy; *(e)* following the hearing, suffering both the humiliation and not-inconsequential monetary loss of Chief Giles suspending Plaintiff for three (3) days without pay for an infraction Plaintiff had not committed and to which women HPD dispatchers are not subjected; *(f)*, *in toto* subjected to the HPD Chief- and Legal Office-lead humiliation and workplace double standards, to which similarly situated women HPD dispatchers are not subjected; and, *(g)* being forced into an intolerable situation where Plaintiff had to decide between continuing coming to work in a toxic, retaliation-suffused, atmosphere, or resigning.

219.  Defendant City's herein-described acts and omissions show that Plaintiff's sex was at least *a* motivating factor for the disparate treatment and averse employment actions Defendant Huntsville perpetrated against Plaintiff.

220. In contrast to Plaintiff, Defendant City and its HPD Dispatch have accommodated women employees who wore earrings and/or other piercings at the workplace and/or allow one or more women to cover or conceal their piercing, demonstrating workplace disparate treatment and adverse disciplinary actions based on sex.

221. Defendant City, by and through the HPD, violated Title VII by intentionally discriminating against Plaintiff based on his sex and/or Huntsville demonstrated deliberate indifference in both its acts and omissions perpetrated against Plaintiff and in its failure or refusal to train and supervise its Chief of Police, Police Department Command Staff, and other persons above Plaintiff in his Chain of Command.

222. Both in isolation and in their totality, the City's – by and through its Chief of Police, City Attorney, and various persons above Plaintiff in his Chain of Command – disparate treatment of and adverse actions taken against Plaintiff during the Summer of 2025 show that discriminating against Plaintiff because of his sex / gender was at least one of the city's motives, even if the employer also had other, lawful motives that were causative in its decision/s.

223. Defendant City, by and through its unlawful acts and omissions set forth in this Count I, including and/or by and through those of its agents and representatives within the HPD, proximately caused Plaintiff to suffer damages, including but not limited to, stress, anxiety, humiliation and other mental anguish, as well as loss of income and benefits.

## COUNT II

## Title VII [42 U.S.C. § 2000e-3(a)]
## Retaliation for Participating in a Protected Activities

224. By this reference Plaintiff reiterates and incorporates the allegations set forth in Paragraphs 1-5 (Jurisdiction / Venue); 6-7, 9-11 (Parties); 12; 14-17 (Background / Context); and 18-88, 91-109, 111-117, 119-142, 147-149, 151-155, 157-160, 162-164, 184-189, 193-196, 199-214 (Title VII / Participation Retaliation), as if fully set out herein.

225. Title VII prohibits employer retaliation against employees who've engaged in protected activities, including participating in proceeding(s) and/or investigation(s) of or relating to (allegations of) workplace discrimination.

226.  Plaintiff engaged in Title VII-protected activities in March 2024, September 2024, December 2024, and May / June 2025 and in late August 2025.

227.  Plaintiff's Title VII participation-related protected activities, set forth by reference in Para. 224 of this Count II are, to a great degree or for the most part, inextricably intertwined with Count I's Title VII sex discrimination claim and Count III's Title VII opposition-related protected activities.

228. These participation-related protected activities included, but are not necessarily limited to, Plaintiff:  *(a)* providing a written statement to Sgt. Springfield in March 2024 regarding Katrina Brady's internal workplace harassment / discrimination complaint/s; *(b)* providing a written statement to Katrina Brady, to eventually be turned

in to the City's HR Department, in September 2024 regarding Katrina Brady's internal workplace harassment / discrimination complaint/s; *(c)* discussing his two (2) written statements with City Attorney Jeanne Rizzardi in or around December 2024, during which Ms. Rizzardi became frustrated with Plaintiff Somerville for not "towing the line" and attempted to pressure Plaintiff to recant his second, September 2024, statement; *(d)* September 2024 written statement being made part of the Brady lawsuit, filed in May 2025 and served on Defendants during the second week of June 2025; *(e)* participating in an August 25, 2025, City / HPD Departmental Hearing that included Plaintiff's being obliged to answer and respond to Lt. Danley's interrogation and (false) accusations regarding Plaintiff's written statements concerning the Katrina Brady workplace discrimination matter/s.

229. During the August 25, 2025, Departmental Hearing, HPD Captain Clardy's, Captain Sumlin's, Deputy Chief Brooks's, City Attorney Rizzardi's and Chief Kirk Giles's silence and refusal to contradict or disavow Lt. Danley's interrogation and false accusations, showed that they – and through them the City – condoned and/or ratified Lt. Danley's treatment of Plaintiff regarding both past and ongoing the Katrina Brady investigation/s and proceedings.

230. Plaintiff suffered adverse employment actions, including, but not limited to: *(a)* being reprimanded by Sgt. Springfield and ordered to remove a piece of innocuous jewelry when women dispatchers were not subjected to the same humiliation and invasion of bodily autonomy; *(b)* being prohibited from leaving work following his

49

completion of a 40-hour work week when over the course of a year or so he had been allowed to do so; *(c)* being subjected to a degrading and humiliating "Departmental Hearing" over a policy Plaintiff had *not*, in fact, violated when similarly situated women dispatchers were not made to suffer such strange and exasperating indignity; *(d)* being berated by Lt. Danley during the Departmental Hearing about Katrina Brady, as Chief Giles and City Attorney Rizzardi looked on in silence, when the subject of the hearing was supposed to be about HPD Dispatch jewelry policy; *(e)* following the hearing, suffering both the humiliation and not-inconsequential monetary loss of Chief Giles suspending Plaintiff for three (3) days without pay for an infraction Plaintiff had not committed and to which women HPD dispatchers are not subjected; and, *(f)* being put into an intolerable situation where Plaintiff had to decide between continuing coming to work in a toxic, retaliation-suffused, atmosphere, or resigning.

231. The adverse acts Defendant City perpetrated against Plaintiff were of such a nature that might well have dissuaded a reasonable worker from availing themselves of their right to oppose workplace discrimination and/or making or supporting a charge of discrimination.

232. A causal connection exists between Plaintiff's protected activities and the adverse actions perpetrated against him.

233. Over the past 2-or-so years, Defendant has developed a track record or pattern and practice of ignoring and/or otherwise giving short-shrift to the prohibition against retaliation within HPD Dispatch.

234. Over the past 2-or-so years Defendant's track record or pattern and practice of retaliation within HPD Dispatch has demonstrated deliberate indifference and failure to train its employees, which in its totality shows a practice that is tantamount to a policy of retaliation within HPD Dispatch.

235. Both in isolation and in their totality, the City's – by and through its Chief of Police, City Attorney, and various persons above Plaintiff in his Chain of Command – adverse actions taken towards Plaintiff during the Summer of 2025 show that the motive to retaliation against Plaintiff for his protected activities was at least one of the City's motives, even if the employer also had other, lawful motives that were causative in its decision/s.

236. "Temporal proximity" can evidence a causal connection between a Title VII-protected activity and an adverse employment action.

237. Circumstances other than temporal proximity can evidence a causal connection between a Title VII-protected activity and an adverse employment action, for example: During the August 25, 2025, Departmental Hearing, Lt. Danley's angrily bringing up Plaintiff's 2024 written statements regarding Katrina Brady relating to the investigation of her then-ongoing internal workplace discrimination claims, then Danley interrogating and berating and showing his and the City's contempt for Plaintiff regarding those statements (the latter of which being quoted in full in Ms. Brady's May 2025 Complaint against the City, served on the City during the second week of June 2025).

238. The allegations set forth in this Count II demonstrate Defendant City of Huntsville violated Title VII of the Civil Rights Act of 1964, specifically 42 U.S.C. § 2000e-3(a)'s prohibition against retaliation against Plaintiff for his participating in one or more protected activities.

239. Defendant City of Huntsville, by and through its unlawful acts and omissions set forth in this Count II, including and/or by and through those of its agents and representatives, proximately caused Plaintiff to suffer damages, including, but not limited to, stress, anxiety, humiliation and other mental anguish, as well as loss of income and benefits.

240. Defendant City of Huntsville, by and through its unlawful acts and omissions set forth in this Count III, including and/or by and through those of its agents and representatives, also proximately caused Plaintiff to suffer the damage of having to choose between continue working in an intolerably toxic, harassment-, discriminatory- and retaliation-filled environment, or resign.

241. Given the choice between working in an intolerably toxic, harassment-, discriminatory- and retaliation-filled environment, or resignation, in or around mid-September 2025, Plaintiff put in his request for disability retirement, and, following its approval by the RSA, resigned effective December 1, 2025.

## COUNT III

### Title VII [42 U.S.C. § 2000e-3(a)]
### Retaliation for Opposing Workplace Discrimination

242. By this reference Plaintiff reiterates and incorporates the allegations set forth in Paragraphs 1-5 (Jurisdiction / Venue); 6-7, 9-11 (Parties); 12-17, 24, 31, 36-42, 52, 64-65 (Background / Context); and 74-108, 110-111, 112-127, 134, 142-146, 148-154, 158, 160-163, 165-214 (Title VII / Opposition Retaliation), as if fully set out herein.

243. Plaintiff engaged in protected activities, including opposing unlawful employment practices including, but not limited to, on July 8, 2025,

244. On July 8, 2025 – during the time Sgt. Springfield was reprimanding Plaintiff in Springfield's office and demanding Plaintiff remove a small piercing he had obtained almost three (3) weeks before – Plaintiff opposed Springfield's sex-based disparate treatment and workplace disciplinary double standards towards him by pointing out that at least two (2) women, Sheryl Sief and Lisa Mason had facial piercings without being chewed-out, reprimanded, or otherwise ordered to remove their respective piercings.

245. Plaintiff pointed out to Sgt. Springfield that Sheryl Sief was allowed to cover her facial piercing, while Lisa Mason's piercing was simply allowed without receiving any negative response, let alone disciplinary action, from Springfield.

246. Sergeant Springfield simply ignored Plaintiff's pointing out the disparate treatment and ordered Plaintiff to remove his small piercing.

247.    Sergeant Springfield threatened Plaintiff with a written write-up or Springfield's recommending termination up Plaintiff's Chain of Command if Plaintiff did not comply and get the small piercing removed.

248.    Owing to Sgt. Springfield's threats, the following morning, June 9, 2025, Plaintiff complied with Sgt. Springfield's discriminatory order and returned to Art-I-Facts in Huntsville and had his small piercing removed.

249.    Notwithstanding Plaintiff complying with Sgt. Springfield's discriminatory acts and order, the following week Sgt. Springfield's suddenly forbade Plaintiff from leaving work on Wednesday mornings following his completion of a 40 hour work week, even though HPD Dispatch would have been fully staffed if Plaintiff left work, something Plaintiff had been allowed to do for a year or more prior to the July 8 incident herein described.

250.    On August 11, 2025, Plaintiff received a Departmental Hearing Notice from HPD Chief Giles, accusing Plaintiff of "willfully" or "purposefully" violating City Policy regarding wearing jewelry.

251.    Plaintiff had not, in fact, willfully or purposefully violated City Policy regarding wearing jewelry in HPD Dispatch.

252.    At least two (2) women wore facial piercings in HPD Dispatch:  One of them allowed to cover / conceal hers and the other allowed to wear hers without incident from up HPD Dispatch's Chain of Command.

253.    Plaintiff had offered and even requested that he be allowed to cover his

54

piercing while at work, as Ms. Sief had been allowed to do, but, like Supervisor Hooper, Sgt. Springfield rejected Plaintiff's request.

254.  At the August 25, 2025, Departmental Hearing convened and presided over by Chief Giles, besides Plaintiff's being berated by Lt. Michael Danley regarding subject matter (Plaintiff's September 2024 written statement given to Katrina Brady) that on its face was utterly unrelated to City Jewelry Policy, HPD Deputy Chief Brooks likewise angrily scolded and falsely accused Plaintiff of violating City Policy regarding jewelry.

255.  At the August 25 Departmental Hearing, while HPD Captain Sumlin and Deputy Chief Brooks berated and falsely accused Plaintiff of violating City Policy regarding jewelry, Chief Giles and City Attorney Rizzardi sat silently by, condoning and ratifying this Captain's and Deputy Chief's discrimination-based interrogation of Plaintiff.

256.  On August 28, 2025, Chief Giles perpetrated additional adverse employment action/s against Plaintiff by presenting him with a "Notice of Disciplinary Action" regarding the jewelry matter, basing this outcome and decision on a City Policy that *(a)* was not uniformly enforced between HPD Dispatch women and men; *(b)* prohibited wearing earrings on the job, but Chief Giles all the way down the HPD Dispatch Chain of Command allowed women dispatchers to do so; *(c)* did not even apply to non-uniformed employees, such as Plaintiff and his HPD coworkers; and, *(d)* allowed employees to "conceal" jewelry to no run afoul of the policy – but Springfield, the Departmental Hearing officers and City attorney in attendance, along with Chief Giles,

didn't care that Plaintiff offered and requested to be allowed to cover his small piercing back on July 8, 2025, and had it removed on July 9.

257.  Chief Giles's August 28, 2025, Notice of Disciplinary Action against Plaintiff visited additional adverse employment actions against Plaintiff by notifying Plaintiff that, in September 2025, he would be suspended for three (3) days without pay.

258. As described herein, Defendant City perpetrated adverse employment actions by and through and/or with the willful participation and encouragement of its agents and representatives, including but not necessarily limited to, Sgt. Springfield, Captain Sumlin, Deputy Chief Brooks, City Attorney Rizzardi and Chief Kirk Giles.

259.  As described herein, Defendant City's adverse employment actions were of such a nature that might well have dissuaded a reasonable worker from availing themselves of their right to oppose workplace discrimination and/or making or supporting a charge of discrimination.

260. As described herein, a causal connection exists between Plaintiff's protected activities and the City's adverse actions perpetrated against him.

261. Over the past 2-or-so years, Defendant has developed a track record or pattern and practice of ignoring and/or otherwise dismissing the prohibition against retaliation within HPD Dispatch.

262. Over the past 2-or-so years Defendant's track record or pattern and practice of retaliation within HPD Dispatch has demonstrated deliberate indifference and failure to train its employees, which, collectively, shows a practice that is tantamount to a policy of

retaliation within HPD and, notably, its Dispatch Department.

263. The allegations set forth in this Count III demonstrate Defendant City Huntsville has violated Title VII of the Civil Rights Act of 1964, specifically 42 U.S.C. § 2000e-3(a)'s prohibiting retaliation against Plaintiff for his participating in a protected activity.

264. Defendant City of Huntsville, by and through its unlawful acts and omissions set forth in this Count III, including and/or by and through those of its agents and representatives, proximately caused Plaintiff to suffer damages, including, but not limited to, stress, anxiety, humiliation and other mental anguish, as well as inconvenience, and loss of income and benefits.

265. Defendant City of Huntsville, by and through its unlawful acts and omissions set forth in this Count III, including and/or by and through those of its agents and representatives, also proximately caused Plaintiff to suffer the damage of having to choose between continue working in an intolerably toxic, harassment-, discriminatory- and retaliation-filled environment, or resign.

266. Given the choice between working in an intolerably toxic, harassment-, discriminatory- and retaliation-filled environment, or resignation, in or around mid-September 2025, Plaintiff put in his request for disability retirement, and, following its approval by the RSA, resigned effective December 1, 2025.

## COUNT IV

### 42 U.S.C. § 1983  -- Kirk Giles

### Deprivation of Civil Rights Under Color of Law

267. By this reference Plaintiff reiterates and incorporates the allegations set forth in Paragraphs 1-3 (Jurisdiction / Venue); 6, 8, (Parties); 11-42, 64-65, 66-69, 74-110, (Background / Context); and 111-114, 117-128, 140, 142-146, 148, 155-157, 161-162, 165-214 (Giles' § 1983 Violations), as if fully set out herein.

268.    The Fourteenth Amendments' Equal Protection and Due Process Clause confers constitutional right to be free from sex / gender discrimination that does not serve important governmental objectives or is not substantially related to the achievement of such objectives.

269.    No legitimate or important government objective is or would have been served by Defendant Giles discriminating between HPD Dispatch women and men regarding a small piercing, whether on an employee's nose or just above their eyebrow.

270.    No legitimate or important government objective is or would have been served by Defendant Giles using or misusing one or more City Policies regarding jewelry-wearing by City employees to discriminate between HPD Dispatch women and men regarding a small piercing, whether on an employee's nose or just above their eyebrow.

271. For years in the Eleventh Circuit and throughout the United States, it has been clearly established that all persons are protected from discrimination on the basis of

gender stereotype.

272. Under color of law in his position as HPD Police Chief, Defendant Giles intentionally violated a constitutional right that was clearly established at the time of his conduct, to wit:  From around July-September 2025 Giles allowed, condoned and or ratified the harassment of Plaintiff owing to Plaintiff's wearing a small piercing above his left eyebrow, when women dispatchers were allowed to wear piercings and earrings.

273. Under color of law in his position and using his authority as HPD Police Chief, Defendant Giles personally and intentionally violated a constitutional right that was clearly established at the time of his conduct, to wit:  From around July-September 2025, on top of the punishments and privations already meted out to Plaintiff, Giles personally and directly punished Plaintiff again by suspending him for three (3) days without pay for having worn a small piercing above his left eye (a piercing Plaintiff offered to cover, and when that was refused, had had removed the day after Sgt. Springfield reprimanded him), when women dispatchers were allowed to wear piercings and earrings.

274. Under color of law in his position and using his authority as HPD Police Chief, Defendant Giles was on actual knowledge that on August 11 and 25, 2025 (then on August 28, when Giles imposed the work suspension punishment on Plaintiff), he was holding Plaintiff, a male, to different, harsher, more rigorous, stricter workplace policy[ies] / rule[s] / standard[s]  than Plaintiff's similarly situated women coworkers, in other words, to a sex/gender-based workplace double standard.

275.  Defendant Giles was personally involved in the violations and deprivations set forth in this Complaint, in particular, in this Count IV.

276.  As a Police Chief, Defendant Giles was on actual knowledge that he was violating Plaintiff's Equal Protection right to be free from workplace sex/gender discrimination.

277.  There was a casual connection between Defendant Giles' acts and omissions and the deprivation of constitutional rights suffered by Plaintiff and the harm and damages resulting therefrom.

278.  The punishment Defendant Giles visited upon Plaintiff under color of law included the embarrassment, humiliation and indignity attendant with the Departmental Hearing and suspension without pay.

279.  The punishment Defendant Giles visited upon Plaintiff under color of law included putting Plaintiff in a position where he had to choose between continuing coming to work in a toxic, discriminatory environment, with actual knowledge that the Chief of Police would punish him even for discriminatory reasons / or using discrimination-based pretexts, or resigning.

280. Defendant Giles, by and through his unlawful acts and omissions set forth in this Count IV, proximately caused Plaintiff to suffer damages, including but not limited to, the deprivation of a Constitutional right, stress, anxiety, humiliation, and loss of income and benefits.

281.  Defendant Giles's July-September deprivations of Plaintiff's constitutionally

protected rights under color of law described herein were perpetrated knowingly, intentionally, callously, wantonly and maliciously.

## COUNT V
### Title VII – Constructive Discharge

282. By this reference Plaintiff reiterates and incorporates the allegations set forth in Paragraphs 1-5 (Jurisdiction / Venue); 6-7, 9-11 (Parties); 12-48, 52-55, 72-79 (Background / Context); and 62-65, 68, 74-214 (Title VII Constructive Discharge), as if fully set out herein.

283. The discriminatory acts and omissions of and all the way up Plaintiff's Chain of Command – and at least one City Attorney, and more than one member of HPD Command Staff, including the HPD Chief of Police – set out in this Complaint in general, and more specifically in the Paragraphs reiterated by reference in this Count V's Paragraphs 74-214 above, describe what by the Summer of 2025 became an increasingly toxic workplace in which Plaintiff could not participate in or oppose Title VII-protected activities without risking, and experiencing, sex discrimination in the form of "drummed-up" and/or misapplied policy violations including but not limited to being berated by superiors and suspended from work without pay by the Police Chief.

284.   The discriminatory acts and omissions up and of Plaintiff's Chain of Command, and at least one City Attorney, and more than one member of HPD Command Staff, including the HPD Chief of Police, created an increasingly toxic

workplace for Plaintiff, and even included Chief Giles August 27/28, 2025, "Disciplinary Action Notice" threat that Plaintiff would be subject to even "more stringent discipline, up to and including termination" for "additional violations," even though an objective observer could see Plaintiff had not violated any policies in July or August 2025. See above, Para. 203.

286.   The bad faith and animus displayed by Sgt. Springfield towards Plaintiff on and after July 8, 2025 (and his personal knowledge admission that Chief Giles works to develop "paper trails" to justify firing HPD employees he wants to get rid of), along with that which attended Lt. Danley's and Deputy Chief Brooks' retaliatory, malicious and antagonistic interrogations of Plaintiff during the August 25 Departmental Hearing while as Chief Giles and City Attorney Rizzardi sat and watched in silence, demonstrated superiors who would stop at nothing to make Plaintiff's worklife miserable.

287.   The acts and omissions of Plaintiff's superiors, including the Chief of Police and a City Attorney, describe a workplace in which Plaintiff would always have to "look over his shoulder" for the next false accusation, threat of termination, disciplinary action, Departmental Hearing, suspension, and/or occasion where his pay would be docked for discriminatory and/or unconstitutional reasons.

288.   Plaintiff's superiors and decision makers' duel violations of Title VII sex discrimination and protected activity retaliation, and the degree to which Sgt. Springfield, Lt. Danley, Deputy Chief Brooks and Chief Giles used bad faith to harass and punish Plaintiff in July-September 2025, along with Sgt. Springfield telling Plaintiff

that HPD actions to "get rid of" another of Plaintiff's former coworkers came down from "The Chief," had become templates for attacking Plaintiff's workplace peace of mind and ability to effectively perform his public service going forward.

298. The facts contained herein show that working conditions became so intolerable a reasonable person in Plaintiff's position would feel compelled to resign.

290. As a reasonable person, Plaintiff – with the RSA's approval – resigned, taking medical retirement, initiated in September 2025 and effective December 1, 2025.

291. Defendant City's acts and omissions perpetrated against Plaintiff and set forth in this Count V – by and through its agents and representatives, and condoned and ratified by its decisionmakers – constituted constructive discharge.

292. Defendant City of Huntsville, by and through its agents' and representatives' unlawful acts and omissions set forth in this Count V, proximately caused Plaintiff to suffer damages, including, but not limited to, stress, anxiety, humiliation and other mental anguish, and loss of income and benefits.

## REQUEST FOR RELIEF

NOW, WHEREFORE, Plaintiff Morgan Somerville respectfully requests the following relief after trial of this case by struck jury:

A. Count I: Entry of judgment in Plaintiff's favor and against Defendant City of Huntsville for compensatory damages, including but not limited to, stress, frustration, mental anguish and lost income as described in Count I of this Complaint.

B. Count II: Entry of judgment in Plaintiff's favor and against Defendant City of

Huntsville for compensatory damages, including but not limited to, stress, frustration, mental anguish and lost income as described in Count II of this Complaint.

C.  Count III:  Entry of judgment in Plaintiff's favor and against Defendant City of Huntsville for compensatory damages, including but not limited to, stress, frustration, mental anguish and lost income as described in Count III of this Complaint.

D.  Count IV:  Entry of judgment in Plaintiff's favor and against Defendant Giles for compensatory damages, including but not limited to, stress, frustration, mental anguish and lost income, as well as for punitive damages for his intentional, malicious and/or wanton acts, as described in Count IV of this Complaint.

E.  Count V:  Entry of judgment in Plaintiff's favor and against Defendant City of Huntsville for compensatory damages, including but not limited to, stress, frustration, mental anguish and lost income as described in Count V of this Complaint.

F.  Plaintiff requests injunctive relief in the form of an Order requiring Defendant to *(i)* re-visit and update its policies regarding workplace discrimination, retaliation, Title VII, and other related laws; and, *(ii)* retrain City Council Members, the Mayor, the Chief of Police, Police Department Command Staff, the City Legal Department, and all employees of the Huntsville Police Department and HPD Dispatch regarding Title VII and related employment discrimination laws.

G.  Plaintiff requests reasonable costs and attorneys fees.

H.  Plaintiff also requests any additional relief in law or equity which this Court deems is entitled to be granted to Plaintiff.

Respectfully filed on this, the 11th day of February, 2026.

s/ *Richard R. Newton*
Richard R. Newton (ASB-0776-w85r)
Richard R. Newton, Attorney at Law, P.C.
Counsel for Plaintiff Morgan Somerville
7027 Old Madison Pike – Suite 108
Huntsville, AL  35806
Tel:  (205) 356-2498
richardrussellnewton@gmail.com

# EXHIBIT A

**Response: Your Civil Rights Division Report - 681530-GLQ from the Employment Litigation Section**

**From** DOJ Civil Rights - Do Not Reply <civilrightsdonotreply@mail.civilrights.usdoj.gov>

**Date** Fri 12/5/2025 2:16 PM

**To** Richardrussellnewton@gmail.com <Richardrussellnewton@gmail.com>

Morgan Somerville v. City of Huntsville, Kirk Giles
United States District Court, Northern District of Alabama

February 11, 2026



U.S. Department of Justice
**Civil Rights Division**

civilrights.justice.gov

681530-GLQ

**NOTICE OF RIGHT TO SUE WITHIN 90 DAYS**

Dec 5, 2025

Morgan Somerville

Re:    Morgan Somerville v. City of Huntsville Alabama, et al.,
EEOC Charge No. 420-2025-05040

Dear Morgan Somerville,

You are receiving this notice because you filed the above charge(s) with the Equal Employment Opportunity Commission (EEOC), and you or your attorney specifically requested this notice.

Because either 180 days have passed since you filed the above charge(s), or because the EEOC has determined that it will not be able to conclude its administrative process within 180 days of the date it assumed jurisdiction of the charge(s), you are hereby notified that you have the right to file a lawsuit commencing a civil action based on the charge(s) under the following statute(s):

- Title VII of the Civil Rights Act of 1964, 42 USC. 42 U.S.C. § 2000e, et seq.

If you decide to file a lawsuit under the statute(s) identified above, **you must file it in the appropriate court within 90 days of receiving this Notice**.  This Notice

should not be taken to mean that the Department of Justice has made a judgment as to whether your charge is meritorious.  If you haven't already, you may want to consult with a private attorney of your own choosing and expense.

If you have questions or wish to inspect the investigative file pertaining to this matter, please address your inquiry to the following EEOC office: Birmingham District Office. Contact information for this office can be located at https://www.eeoc.gov/field-office/birmingham/location.

Sincerely,

Complaint Referral Unit
Employment Litigation Section
Civil Rights Division

CC: ███████████████ Richardrussellnewton@gmail.com, Djc@lanierford.com, sheri.guenster@eeoc.gov

## Contact

civilrights.justice.gov

 U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

 (202) 514-3847
1-855-856-1247 (toll-free)
Telephone Device for the Deaf
(TTY) (202) 514-0716